AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.    21-MR-803
)
10335 CUEVA DEL OSO NE, )
ALBUQUERQUE, NM, 87111 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

AS DESCRIBED IN ATTACHMENT A

located in the _____ District of _____ NEW MEXICO _____ , there is now concealed *(identify the person or describe the property to be seized):*

AS DESCRIBED IN ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distributing and possessing with intent to distribute a controlled substance |
| 21 U.S.C. § 846 | Conspiracy to distribute and posses with intent to distribute a controlled substance |

The application is based on these facts:

See the attached affidavit of DEA Task Force Officer Michael Schlattman, which is incorporated by reference and has been reviewed and approved by AUSA Shana B. Long

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Schlattman, Task Force Officer, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ **Telephone** _____ *(specify reliable electronic means).*

Date: _____ June 10, 2021 _____      _____
*Judge's signature*

City and state: Albuquerque, New Mexico      United States Magistrate Judge Laura Fashing
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANTS

I, Michael B. Schlattman, being first duly sworn, hereby depose and state as follows

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for warrants to search the following premises (hereinafter referred

to collectively as "**THE SUBJECT PREMISES**)" as more fully described in Attachments A for

the items described in Attachments B:

| | |
|---|---|
| **Seibel Residence 1**<br>10319 Casador Del Oso NE<br>Albuquerque, New Mexico 87111 | **Seibel/Windish Residence 2**<br>10335 Cueva Del Oso NE<br>Albuquerque, New Mexico 87111 |
| **Pettit's Residence**<br>8004 Grand Ave NE Apt. A<br>Albuquerque, New Mexico 87108 | **Pettit's Storage**<br>American Self Storage<br>8531 Indian School Rd NE, Unit A117<br>Albuquerque, New Mexico 87112 |
| **Dockery's Residence**<br>La Vida Buena Apartments<br>2201 Ambassador Rd NE Unit 110<br>Albuquerque, New Mexico 87112 | |

### AGENT BACKGROUND AND EXPERIENCE

2.      I am a Task Force Officer (TFO) with the Drug Enforcement Administration

(DEA) and have been since June 2020.  As such, I am a "federal law enforcement officer" within

the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent

engaged in enforcing the criminal laws and duly authorized by the Attorney General to request

arrest and search warrants.  Furthermore, I am a law enforcement officer of the United States

within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct

investigations and to make arrests for criminal offenses, to include those enumerated in 18

1

U.S.C. § 2516.  Prior to being a TFO with the DEA, I have worked as a full-time sworn law enforcement officer with the Bernalillo County Sheriff's Office (BCSO) since March 2012.

3.      In my time as a DEA TFO and BCSO Deputy, I have received training on surveillance and counter-surveillance operations, undercover operations, confidential source operations, criminal law, and investigations involving federal electronic surveillance statutes, drug identification, and search warrant executions.  I have also spoken with other law enforcement officers with expertise and experience in these areas.

4.      My experience as a DEA TFO and BCSO Deputy includes, but is not limited to, conducting surveillance, interviewing witnesses, writing affidavits for and executing search and seizure warrants, debriefing defendants and confidential sources, and working with undercover agents and informants.  I have received training and have experience in the investigation of violations of the federal drug and money laundering laws, including the offenses listed below. As a result, I am familiar with matters including, but not limited to, the means and methods used by drug traffickers and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.  I also have experience in analyzing and interpreting drug codes and cryptic dialogues used by drug traffickers.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## BACKGROUND OF INVESTIGATION

6.      I am the co-case agent for the investigation of John "Ringo" Seibel ("Seibel") and others associated with Seibel and his Albuquerque, New Mexico, area drug trafficking organization (the "SEIBEL DTO"). The investigation of the SEIBEL DTO employed a number

of investigative techniques, including a cooperating defendant ("CD"), undercover agents ("UCs"), physical surveillance and electronic surveillance. The investigative efforts of the DEA have revealed the SEIBEL DTO to be a multi-kilogram poly-drug trafficking organization whose day-to-day activities are currently run by Seibel. To date, we have conducted numerous buy/walk operations utilizing a UC spanning the course of several months, demonstrating the sustained and ongoing drug trafficking activities by the SEIBEL DTO.

7.      This investigation identified several members and affiliates of the SEIBEL DTO, specifically Seibel, Robert "Preacher" Pettit Sr. ("Pettit Sr."), Robert Pettit Jr. ("Pettit Jr."), Barbara Windish Dockery ("Dockery") and Erica Windish ("Windish") (collectively, "the **SUBJECTS**").

8.      As a result of my personal participation in the investigation, statements made to me by other law enforcement personnel involved in the investigation, reviews of reports of other law enforcement personnel which I have read and deemed to be reliable, I believe there is probable cause that the **SUBJECTS** have committed, are committing, and will continue to commit offenses involving violations of *inter alia*:

     a.    21 U.S.C. § 841 – Distribution of controlled substances, including methamphetamine and fentanyl;

     b.    21 U.S.C. § 846 – Conspiracy to distribute controlled substances; and

     c.    21 U.S.C. § 856 – Maintaining a place for manufacture, distribution, or use of controlled substances.

## EVIDENCE SOUGHT DURING SEARCH

9.     Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

10.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

11.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly

4

store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

12.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

13.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

14.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site

storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

15.     Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

16.     Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

17.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

18.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their

person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

19.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

20.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos

8

and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

21.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

22.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

23.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

24.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more

9

of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

25.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

26.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones,

iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any

physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy

disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

27.    A list of items agents seek authority to seize is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28.    As described above and in Attachment B, this application seeks permission to

search for evidence and records that might be found on the PREMISES, in whatever form they

are found.  Much of the evidence and records described in the paragraphs above, and in

Attachment B, can also be produced and/or stored on computers, digital media and other storage

media.  For this reason, I submit that if a computer, digital medium, or storage medium is found

on the PREMISES, there is probable cause to believe those records will be stored on that

computer or storage medium. Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all

under Rule 41(e)(2)(B).

29.    *Necessity of seizing or copying entire computers or storage media.*  In most cases,

a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

11

destruction. This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

30.      *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information

consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## FOR INCLUSION IN THE AFFIDAVIT IN SUPPORT OF THE WARRANT

31.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint

sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

        c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

        d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

        e.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed

by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

    h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **PROBABLE CAUSE**

    32.  In February 2021, DEA agents and officers interviewed a Cooperating Defendant ("CD")[1] with intimate knowledge of a drug trafficking organization lead by Seibel of Albuquerque, New Mexico. The CD detailed his/her involvement in the SEIBEL DTO as a distributor and facilitator of the DTO. The CD stated a man named "Johnny" was the head of the SEIBEL DTO. The CD positively identified "Johnny" as Seibel. The CD estimated the SEIBEL DTO provided him/her with 19 pounds of methamphetamine since October 2020, the most recent distribution being in December 2020.

    33.  The CD also identified a man named "The Preacher" who was responsible for transporting methamphetamine to the CD from Albuquerque for the SEIBEL DTO. Additionally,

---

[1] The CD was arrested and provided information for potential consideration on his/her pending charges.

16

"The Preacher" collected money from the CD and was known to the CD as an "enforcer" for the SEIBEL DTO. The CD positively identified "The Preacher" as Pettit Sr.. Furthermore, additional information provided by the CD was independently corroborated by law enforcement resources to include surveillance operations in Albuquerque, New Mexico. Additionally, agents and officers found the CD's information to be accurate and reliable.

### Pill Press Order

34.     In February 2021, agents reviewed a purchase order reflecting that "Robert Pettit" of "Pett Enterprise" recently purchased a pill press machine, specifically, an Encapsulating Machine also known as a TDP 5 Electric Desktop Tablet[2] Press with the capabilities of pressing several thousand pills an hour.  The purchase order listed the shipping address as 8004 Grand Ave NE Apt. A, Albuquerque, New Mexico 87108.  This has been identified as Pettit Sr.'s residence that he shares with his son, Pettit Jr. (hereinafter, **Pettit's Residence**).[3] FedEx records reflect this pill press was delivered to **Pettit's Residence** on January 28, 2021.  This same address is listed on the driver's license of Pettit Sr.

35.     Agents reviewed an additional purchase order by "Robert Pettit" with **Pettit's Residence** listed as the receiver. The order revealed the purchase of a GR 60 Powder Granulator[4]

---

[2] The TDP 5 Electric Desktop Tablet Press is advertised as having the capabilities to produce 4,800 tablets an hour. The TDP 5 has measurements of 2.29 ft. x 1.31 ft. x 2.62 ft. and weighs 275.5 lbs.

[3] As described further below, agents have surveilled Pettit Sr. traveling to and from this residence on numerous occasions, frequently before and/or after drug deals. Agents have also observed a vehicle registered to Pettit Jr. as well as vehicles rented by Pettit Sr. parked in front of **Pettit's Residence** on numerous occasions.

[4] The GR 60 Powder Granulator is advertised as turning powders into granules. The GR 60 Powder Granulator has measurements of 1.50 ft. x 1.80 ft. x 1.87 ft. and weighs 166.4 lbs.

machine and VH 8 Powder Mixer[5] machine. Both machines are used to combine and/or granulate dry powder materials. FedEx records reflect these machines were delivered to **Pettit's Residence** on January 25, 2021.

36.      An additional purchase order of materials revealed that in January 2021, "Robert Pettit" purchased 75 kilograms of Firmapress yellow material. This purchase order also listed **Pettit's Residence** as the mailing address. Based on my training, experience and information received, the Firmapress yellow material is used to press Xanax tablets. Additionally, in February 2021, "Robert Pettit" purchased three kilograms of lactose powder, another binding agent used in a press machine. This purchase order listed **Pettit's Residence** as the mailing address. Based on this information and the training and experience of agents, agents believed that "Robert Pettit" purchased these materials and machines to produce counterfeit pills for the SEIBEL DTO.

## March 07, 2021 Surveillance Operation

37.      On March 07, 2021, agents were notified that a vehicle rented by Pettit Sr. had traveled to Arizona.[6] On the same date, later in the evening, agents established surveillance on Pettit Sr.'s vehicle on his return into New Mexico and positively identified Pettit Sr. to be driving the vehicle. Agents maintained surveillance on Pettit Sr. and followed the vehicle to 10319 Casador Del Oso NE, Albuquerque, New Mexico, which has been identified as Seibel's

---

[5] The VH 8 Powder Mixer is advertised as combining dry materials. The VH 8 Powder Mixer has measurements of 1.9 ft. x 1.64 ft. x 1.64 ft. and weighs 165 lbs.

[6] Throughout this investigation, agents have observed Pettit Sr. travel to Arizona on a near weekly basis, sometimes multiple times within one week. Pettit Sr. typically travels from New Mexico to Arizona and back to New Mexico within a 12-14 hour period. Additionally, Seibel and Pettit Sr. have both informed the UC that they have to travel west to "re-up". Based off the training and experience of agents, Seibel and Pettit Sr. are referencing retrieving narcotics in Arizona and bringing them back to New Mexico for re-distribution.

residence (**Seibel Residence 1**). Once Pettit Sr. parked at **Seibel Residence 1,** Seibel entered

Pettit Sr.'s vehicle. Agents maintained surveillance on the vehicle and followed the vehicle to the

parking lot of the La Vida Buena Apartments complex located at 2201 Ambassador Rd. NE,

Albuquerque, New Mexico 87112 (as described further below, there is probable cause to believe

that Dockery resides at Unit 110 in this apartment complex, herein after referred to as **Dockery's**

**Residence**). Moments later, agents observed the vehicle depart the area of **Dockery's Residence**

and return to the parking lot of **Dockery's Residence** shortly after. Because of the vantage point,

the agents conducting surveillance were unable to see who entered or exited Pettit Sr.'s vehicle

while in the parking lot of **Dockery's Residence**. Moments later, however, agents observed

Pettit Sr.'s vehicle depart the area of **Dockery's Residence** and travel to a convenience store.

Agents maintained surveillance of the vehicle and followed the vehicle back to the parking lot of

**Dockery's Residence**. During this time agents observed Seibel re-enter Pettit Sr.'s vehicle and

depart the area.[7]

## March 2021 UC Operation 1

38.     In March 2021, a UC arranged to purchase a large amount of pills suspected to be

counterfeit pills containing fentanyl from Seibel in Albuquerque, New Mexico. On the day of the

meet, a brown 2011 Acura MDX SUV bearing New Mexico license plate number 485WRD

("Seibel Vehicle") was observed at **Seibel Residence 1**.  Agents observed the Seibel Vehicle

depart **Seibel Residence 1** and arrive at the agreed-to location where the UC was waiting. Seibel

exited the Seibel Vehicle and entered the UC's vehicle.

---

[7] Because Seibel had earlier driven with Pettit Sr. to the parking lot of **Dockery's Apartment**, Seibel must have
exited the vehicle at one point. However, as noted above, agents were unable to surveil on this occasion when that
occurred or where Seibel went.

39.     Once in the vehicle, Seibel and the UC discussed the fentanyl pills that the UC could purchase from Seibel. Seibel then provided the UC with a large amount of unmarked yellow pills at no cost. Additionally, Seibel informed the UC that he was able to produce several thousand pills an hour and could shape as well as stamp the pills however the UC preferred. After this meet, Seibel exited the UC's vehicle and entered the Seibel Vehicle. Agents maintained surveillance on Seibel after the drug deal and followed Seibel from the meet location to **Seibel Residence 1**. Agents observed Seibel exit his vehicle and enter **Seibel Residence 1**. DEA agents conducted a field test on one of the pills and the pill presented presumptive positive for fentanyl.

## **April 2021 UC Operation 2**

40.     In early April 2021, the UC arranged to purchase methamphetamine and "blues[8]" from Seibel at a location in Albuquerque, New Mexico. On the day of the meet, agents observed Pettit Sr. exit **Pettit's Residence** carrying a large black bag to his vehicle and depart the area of **Pettit's Residence**. According to information obtained from American Self Storage, after Pettit Sr. left his house, he traveled to American Self Storage located at 8531 Indian School Rd NE. A Robert Pettit has a storage unit rented specifically, Unit A117 at this facility. The facility is accessed through a security keypad that requires a key code. Based on these keypad entries, the facility can generate a list of which storage unit renter enters and exits the facility and at what time. According to information obtained from the storage facility, Pettit Sr. entered his pin code

---

[8] Based on the training and experience of agents, "blues," "Mexican blues," or "M-30's" is a slang term for counterfeit oxycodone pills that have a blue coloring and are marked with an "M" on one side and "30" on the other side. Counterfeit oxycodone pills are sold at a reduction of the standard pharmaceutical price and usually contain fentanyl.

to gain access to the facility shortly after he left **Pettit's Residence**. According to the key code times, Pettit entered the storage facility using this key code and then exited approximately four minutes later.[9]

41.     Moments later, agents observed Pettit Sr.'s vehicle arrive at **Seibel Residence 1** and Seibel entered the vehicle. Agents maintained surveillance on Pettit Sr.'s vehicle and followed the vehicle to the agreed-to location where the UC was waiting. Agents observed Pettit Sr. grab an orange bag from behind the driver seat. Seibel exited Pettit Sr.'s vehicle carrying a black case and entered the UC vehicle. Once in the UC vehicle, Seibel opened the black case and retrieved a large amount of "blues" and methamphetamine from the case, which he then handed to the UC. The UC paid for both narcotics and Seibel returned to Pettit Sr.'s vehicle. After this meet, agents maintained surveillance on Pettit Sr.'s vehicle and observed Pettit Sr. and Seibel drive back to **Seibel Residence 1**. Agents observed Seibel exit Pettit Sr.'s vehicle and enter **Seibel Residence 1**.

42.     DEA agents conducted a field test on one of the pills and the pill presented presumptive positive for fentanyl. DEA agents conducted a field test of the suspected methamphetamine that presented presumptive positive for methamphetamine.

### April 2021 UC Operation 3

43.     In mid-April 2021, the UC arranged to purchase methamphetamine and additional fentanyl pills in Albuquerque, New Mexico. On the day of the meet, agents observed Pettit Sr. exit **Pettit's Residence** carrying an orange case to his vehicle and depart the area of **Pettit's**

---

[9] Because only the keypad information was available at this time, agents were unable to determine if Pettit Sr. entered a particular storage unit at this time. However, later surveillance and information obtained from the storage facility has confirmed that Pettit Sr. maintains, and frequently accesses **Pettit's Storage.**

**Residence**. Agents maintained surveillance on Pettit Sr.'s vehicle, and followed it to **Seibel Residence 1** where Seibel entered the vehicle. Agents maintained surveillance on Pettit Sr.'s vehicle and followed the vehicle to the agreed-to location where the UC was waiting. The UC observed Pettit Sr. grab an orange case from behind the driver seat and bring the case to the front area. (The UC, however, was unable to see if Pettit Sr. handed Seibel something from that case during this UC buy.) Seibel exited Pettit Sr.'s vehicle and entered the UC vehicle. Once in the UC vehicle, Seibel provided the UC a large amount of unmarked yellow pills and methamphetamine. The UC paid for both narcotics in cash that was in a bag and Seibel returned to Pettit Sr.'s vehicle.

44.     After this meet, Pettit Sr. drove Seibel back to **Seibel Residence 1**. Agents observed Seibel enter **Seibel Residence 1** carrying a bag that resembled that of the one provided by the UC that contained the payment for the narcotics. Agents maintained surveillance of Pettit Sr.'s vehicle and it was followed to **Pettit's Storage**, where agents observed Pettit Sr. retrieve an additional orange case from the storage unit. Agents maintained surveillance on Pettit Sr.'s vehicle and it was followed to **Pettit's Residence.**

45.     DEA agents conducted a field test on one of the pills and the pill presented presumptive positive for fentanyl. DEA agents conducted a field test of the suspected methamphetamine that presented presumptive positive for methamphetamine.

### Pettit's Storage Surveillance

46.     On April 15, 2021, agents conducted surveillance on **Pettit's Storage**. On this date, agents observed Pettit Sr. arrive in the area of **Pettit's Storage** unit, exit his vehicle and remove an orange case from his vehicle. Pettit Sr. was then observed entering the storage unit

with the orange case, exit the storage unit with the orange case a short time later, and place the orange case inside of his vehicle. Moments later, Pettit Sr. departed the area of **Pettit's Storage**.

47.     On April 19, 2021, agents conducted surveillance on **Pettit's Storage**. On this date, agents observed Pettit Sr. arrive in the area of **Pettit's Storage** unit, exit his vehicle and remove a black case from his vehicle. Pettit Sr. was then observed entering the storage unit with the black case, exit the storage unit with the black case and place the black case inside of his vehicle. Moments later, Pettit Sr. departed the area of **Pettit's Storage**.

48.     On May 04, 2021, agents conducted surveillance on **Pettit's Storage**. On this date, agents observed Pettit Sr. arrive in the area of **Pettit's Storage** unit, exit his vehicle and open his storage unit. Pettit Sr. was then observed entering the storage unit, removing a large black item and placing it into the back of his vehicle. Pettit Sr. was then observed closing the storage unit and departed the area of **Pettit's Storage**.

49.     On May 05, 2021, agents conducted surveillance on **Pettit's Storage**. On this date, agents observed Pettit Jr. arrive in the area of **Pettit's Storage** unit, exit his vehicle and open his storage unit. Pettit Jr. was then observed entering the storage unit, removing a black item and placing it into his vehicle. Pettit Jr. was then observed closing the storage unit and departed the area of **Pettit's Storage**.

50.     On May 09, 2021, agents conducted surveillance on **Pettit's Storage**. On this date, agents observed Pettit Jr. arrive in the area of **Pettit's Storage** unit, exit his vehicle and open his storage unit. Pettit Jr. was then observed entering the storage unit, removing a white bucket and placing it into his vehicle. Pettit Jr. was then observed closing the storage unit and departed the area of **Pettit's Storage**.

51.     On May 22, 2021, agents conducted surveillance on **Pettit's Storage**. On this date, agents observed Pettit Sr. arrive in the area of **Pettit's Storage** unit, exit his vehicle and open his storage unit. Pettit Sr. was then observed entering the storage unit, removing two large containers and placing them into the back of his vehicle. Pettit Sr. was then observed closing the storage unit and departed **Pettit's Storage**. Moments later, agents observed Pettit Sr. arrive at **Pettit's Residence**. Agents observed Pettit Sr. then remove the two large containers from his vehicle and bring them into **Pettit's Residence**.[10]

### April 26, 2021 Surveillance Operation

52.     On April 26, 2021, agents conducted surveillance on **Seibel Residence 1**. During the day, agents observed Seibel depart **Seibel Residence 1** in Seibel's Vehicle. Agents observed Seibel arrive in the parking lot of **Dockery's Residence** and park his vehicle. Moments later, agents observed Seibel exit Seibel's Vehicle carrying an orange case and enter Building 1 where **Dockery's Residence** is located. Moments later, agents observed Seibel exit Building 1 without the orange case and enter his vehicle. Agents maintained surveillance on Seibel and followed him to **Seibel Residence 1**.

### May 2021 UC Operation 4

53.     In mid-May 2021, the UC arranged to purchase methamphetamine from Seibel. On the day of the meet, agents observed Pettit Sr. exit **Pettit's Residence** carrying a black case to his vehicle and depart the area of **Pettit's Residence**. Agents maintained surveillance of Pettit Sr. and he was followed to **Seibel Residence 1** and Seibel entered the vehicle. Agents followed

---

[10] According to the keypad information maintained by the facility, the pin was also used on May 31, 2021, to access Pettit's Storage. However, agents were unable to surveil who entered the storage facility on that date (i.e. whether it was Pettit Sr. or Pettit Jr.).

Pettit Sr.'s vehicle to the agreed-to location where the UC was waiting. Seibel exited Pettit Sr.'s vehicle and entered the UC vehicle. Seibel subsequently provided the UC with the methamphetamine. During the meet, the UC ordered a large number of the self-pressed yellow fentanyl pills specifically in the shape of a Xanax tablet[11]. Seibel and the UC exited the UC vehicle and proceeded to speak with Pettit Sr. inside Pettit Sr.'s vehicle. Seibel and Pettit Sr. informed the UC that several hours were needed to produce such a large order. The UC agreed to wait and purchased the methamphetamine. The UC paid Seibel in cash that was in a bag.

54.     Seibel returned to Pettit Sr.'s vehicle and agents maintained surveillance on the vehicle, observing that Pettit Sr. and Seibel drove directly from the meet location back to **Seibel Residence 1**. Once Pettit Sr.'s vehicle arrived, agents observed Seibel enter **Seibel Residence 1** carrying a bag that resembled that of the one provided by the UC that contained the payment for the narcotics. Agents maintained surveillance of Pettit Sr. and he was followed directly to **Pettit's Residence** from **Seibel Residence 1**. Agents maintained constant surveillance of **Pettit's Residence** and **Seibel Residence 1** throughout the day. On the same day, agents observed Seibel leave **Seibel Residence 1** in Seibel's Vehicle and agents maintained surveillance on Seibel's Vehicle. Agents observed Seibel arrive in the area of **Pettit's Residence** in Seibel's Vehicle and Pettit Sr. approached Seibel's Vehicle carrying an orange case. The orange case was given to Seibel and Pettit Sr. returned to **Pettit's Residence**. Agents maintained surveillance on Seibel's Vehicle and followed the vehicle to the area of **Dockery's Residence**. Agents observed Seibel exit his vehicle, retrieve the orange case and enter Building 1 where **Dockery's Residence** is

---

[11] The UC and Seibel had previously spoken about Seibel pressing yellow pills to look like Xanax pills. Prior to this meet Seibel informed the UC that he received the materials that would make the pills in the shape of a Xanax pill.

located. Moments later, agents observed Seibel exit Building 1 without the orange case and re-enter his vehicle and depart the area.

55.     Later in the day, agents observed Seibel exit **Seibel Residence 1** and walk to 10335 Cueva Del Oso NE, Albuquerque, New Mexico ("**Seibel/Windish Residence 2**"). Agents observed a vehicle driven by Windish in the driveway of **Seibel/Windish Residence 2** and Windish in the driver's seat. Seibel was observed retrieving a white package from the side of **Seibel/Windish Residence 2** and then entered Windish's vehicle with the package. Agents maintained surveillance of Windish and Seibel and followed them to a location where Seibel exited Windish's vehicle and entered another vehicle. Moments later, agents observed Seibel exit the vehicle and re-enter Windish's vehicle. Agents followed Windish and Seibel directly back to **Seibel/Windish Residence 2**. Agents observed Seibel enter **Seibel/Windish Residence 2** carrying the white package and Windish entering **Seibel/Windish Residence 2** shortly after. Based on my training and experience, these events between Seibel and the driver in the vehicle coincide with a drug transaction. Additionally, agents learned the driver of said vehicle has a prior criminal history involving the trafficking of a controlled substance specifically, methamphetamine.

56.     Later in the day, agents observed Seibel depart **Seibel Residence 1** in Seibel's Vehicle and drive to **Pettit's Residence**. Seibel parked, and Pettit Sr. exited his residence and approached Seibel's vehicle. After meeting with Seibel, Pettit Sr. went back into **Pettit's Residence** carrying a small brown bag and Seibel drove directly to the agreed-to location where the UC was waiting. Subsequently, Seibel provided the UC with over 100 of the yellow pills resembling a Xanax tablet.

26

57.     After the UC purchase, agents maintained surveillance on Seibel and followed Seibel to **Seibel Residence 1**. However, after Seibel parked in the driveway of **Seibel Residence 1**, rather than enter the residence, he exited his vehicle and walked to **Seibel/Windish Residence 2** and entered **Seibel/Windish Residence 2**.

58.     **Seibel Residence 1** is located one block south of **Seibel/Windish Residence 2**. **Seibel/Windish Residence 2** is the address of record on both Seibel and Windish's driver's licenses. Agents have conducted multiple spot checks of **Seibel/Windish Residence 2** and observed at least one vehicle registered to Windish every time.

59.     DEA agents conducted a field test on one of the pills and the pill presented presumptive positive for fentanyl. DEA agents conducted a field test of the suspected methamphetamine that presented presumptive positive for methamphetamine.

### May 2021 Trash Pull Operation

60.     In mid-May 2021, agents conducted a trash pull operation from a trash bin utilized by Pettit Sr. and Pettit Jr. at **Pettit's Residence**. Agents observed Pettit Jr. exit **Pettit's Residence** and place a weighted white trash bag into the trash bin that agents maintained constant surveillance on. Moments later, agents observed there was only one weighted white trash bag in the trash bin and agents retrieved the bag. Inside of the bag, agents identified and field tested a crystal-like substance that presented presumptive positive for methamphetamine. Additionally, agents retrieved clear plastic wrappings coated in a black greasy substance as well as carbon paper inside the trash bag. Based off the training and experience of agents, agents believe these wrappings were previously used to package narcotics.

### May 2021 UC Operation 5

61.     At the end of May 2021, the UC arranged to purchase several pounds of methamphetamine and "blues" in Albuquerque, New Mexico. On the day of the meet, agents observed Pettit Sr. exit **Pettit's Residence** carrying a large black bag to his vehicle and depart the area of **Pettit's Residence**. Agents maintained surveillance on Pettit Sr.'s vehicle, and followed it to **Seibel Residence 1**. Agents observed Pettit Sr. park his vehicle and enter the property of **Seibel Residence 1** carrying a large black bag. Moments later, agents observed Pettit Sr. carrying a large black bag and Seibel exit **Seibel Residence 1** and enter Pettit Sr.'s vehicle.

62.     Agents maintained surveillance on Pettit Sr.'s vehicle and followed the vehicle to **Dockery's Residence** and park. Moments later, agents observed Seibel exit Pettit Sr.'s vehicle carrying a large black bag and enter Building 1 where **Dockery's Residence** is located. Moments later, agents observed Seibel exit Building 1 where the **Dockery's Residence** is located carrying a large black bag and re-enter Pettit Sr.'s vehicle.

63.     Agents maintained surveillance of Pettit Sr.'s vehicle and followed the vehicle to the agreed-to location where the UC was waiting. The UC observed Seibel open a large black bag and then proceed to open a black case in the front passenger seat of Pettit Sr.'s vehicle. Seibel exited Pettit Sr.'s vehicle and entered the UC vehicle. Once in the UC vehicle, Seibel provided the UC a large amount of methamphetamine and "blues." The UC paid for both narcotics in cash that was in a green bag. Seibel returned to Pettit Sr.'s vehicle.

64.     After this meet, Pettit Sr. drove Seibel back to **Seibel Residence 1**. Agents observed Pettit Sr. carrying a large black bag and Seibel enter **Seibel Residence 1**. Moments later, agents observed Pettit Sr. exit **Seibel Residence 1** carrying a large black bag, enter his vehicle and depart the area. Agents maintained surveillance of Pettit Sr.'s vehicle and it was

followed to **Pettit's Residence** where agents observed Pettit Sr. exit his vehicle carrying a large black bag and enter **Pettit's Residence**.

65.     Additionally, agents maintained surveillance on Seibel and observed Seibel enter Seibel's Vehicle and drive to **Dockery's Residence**. Moments later, agents observed Seibel enter Building 1, where **Dockery's Residence** is located. Moments later, agents observed Seibel depart the area in Seibel's Vehicle and conduct a maneuver in an attempt to observe law enforcement surveillance and surveillance was eventually terminated on that date.

66.     DEA agents conducted a field test on one of the pills and the pill presented presumptive positive for fentanyl. DEA agents conducted a field test of the suspected methamphetamine that presented presumptive positive for methamphetamine.

67.     During this operation, agents observed Seibel on both occasions enter level 1 of Building 1. Seibel was not observed going up the staircase that can be viewed from the outside. Based on this, agents determined that Seibel remained on level 1 of Building 1 on both occasions he entered the apartment complex on this date. Information obtained from law enforcement databases and directly from La Vida Buena Apartments confirmed that Dockery has rented Unit 110 since August of 2020 and a current driver's license listing the La Vida Buena Apartments as her address. In addition, agents have observed Dockery's registered vehicle in the parking lot of **Dockery's Residence**. Based on this, there is probable cause to believe that **Dockery's Residence** is Dockery's primary residence.

68.     In terms of Dockery's connection to the Seibel DTO, other evidence (in addition to the surveillance described herein) demonstrate that Dockery is Seibel's close associate. As noted above, Windish is another of Seibel's associates. Dockery has listed Windish as her

29

emergency contact on the rental agreement specifically, titling Windish as her daughter. Dockery also provided La Vida Buena Apartments with a telephone number in the rental agreement that is in contact with a phone number believed to be used by Seibel. A toll analysis of the two phone numbers revealed the numbers were in contact over 200 times within a recent 30-day period. Police reports also obtained on Dockery establish that Dockery is Windish's mother. Dockery has a criminal history of several possession of a controlled substance charges dating back to 2002 and most recently in 2018. Seibel's frequent trips to **Dockery's Residence** and/or the parking lot of her apartment complex during the times surrounding the drug deals with the UC establish probable cause to believe that Dockery and Seibel are storing drugs and evidence of drug trafficking in Dockery's Residence.

**Summary of Subject Premises**

69.     Based on the facts described herein, there is probable cause to believe that Seibel's primary residence is **Seibel Residence 1**, and that stores drugs, drug trafficking proceeds, and evidence of drug trafficking on behalf of the SEIBEL DTO at **Seibel Residence 1**. Seibel was last observed at this residence on June 03, 2021 and his vehicle in the driveway of **Seibel Residence 1** on June 04, 2021.

70.     Based on the facts described herein, there is probable cause to believe that **Seibel/Windish Residence 2** is Windish's primary residence and a residence that Seibel uses to store drugs, drug trafficking proceeds, and evidence of drug trafficking on behalf of the SEIBEL DTO. A vehicle registered to Windish was last observed at **Seibel/Windish Residence 2** on June 04, 2021.

71.     Based on the facts described herein, there is probable cause to believe that **Pettit's**

30

**Residence** is the primary residence of Pettit Sr., and that he lives there with his son, Pettit Jr. There is also probable cause to believe that Pettit Sr., Pettit Jr., and the SEIBEL DTO stores drugs, drug trafficking proceeds and evidence of drug trafficking at **Pettit's Residence**. Pettit Sr. and Pettit Jr. were last observed at **Pettit's Residence** on June 02, 2021. Pettit Jr.'s vehicle was last observed parked in front of **Pettit's Residence** on June 04, 2021.

72.     Based on the facts described herein, there is probable cause to believe that the SEIBEL DTO stores drugs, drug trafficking proceeds and evidence of drug trafficking at **Pettit's Storage**. As noted above, **Pettit Storage** was last accessed on May 31, 2021.

73.     Based on the facts described herein, there is probable cause to believe that Dockery resides at **Dockery's Residence,** and that Dockery stores drugs, drug trafficking proceeds and evidence of drug trafficking for the SEIBEL DTO at **Dockery's Residence**. As noted herein, Seibel traveled to **Dockery's Residence** before and after the purchase of drugs by the UC at the end of May 2021. Dockery's vehicle was last observed at this residence on June 04, 2021.

74.     Based on this information, there is probable cause to believe the Seibel DTO stores drugs, drug trafficking proceeds, drug paraphernalia and evidence of drug trafficking at **Seibel Residence 1**, **Seibel/Windish Residence 2**, **Pettit's Residence**, **Pettit's Storage**, and **Dockery's Residence** (the **SUBJECT PREMISES**).

## CONCLUSION

75.     I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT PREMISES** described in Attachment A and seize the items described in Attachment B.

31

I swear that this information is true and correct to the best of my knowledge and belief.

MICHAEL B. SCHLATTMAN
Task Force Officer
Drug Enforcement Administration

Telephonically sworn and electronically signed
This 10th day of June, 2021.

LAURA FASHING
UNITED STATES MAGISTRATE JUDGE

32

## ATTACHMENT A

*Property to be searched*

The property to be searched is 10335 CUEVA DEL OSO NE, ALBUQUERQUE, NEW MEXICO 87111 ("Seibel/Windish Residence 2"), further described as a single story residence with the garage door facing south. The home has a flat roof and the building is of tan color. Photographs of the Seibel/Windish Residence 2 are included below: ·





2

The search of the above Seibel/Windish Residence 2 shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the Seibel/Windish Residence 2, and all persons located in the Seibel/Windish Residence 2 in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, the Seibel/Windish Residence 2 that have an apparent connection to the Seibel/Windish Residence 2 and/or the residents of the Seibel/Windish Residence 2. Connection to the vehicle may be established by evidence that anyone residing at the Seibel/Windish Residence 2 own, operate, and/or have access to any vehicle parked at or in front of the Seibel/Windish Residence 2. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

3

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841(a)(1) and 846, those violations involving John Robert SEIBEL and Erica WINDISH, including:

1. Controlled substances, including methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

4

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the place to be searched, including titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

5

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

During the execution of the search of the Seibel/Windish Residence 2 described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

6